577 So.2d 1167 (1991)
Joy W. MANSON, Plaintiff-Appellant,
v.
CITY OF SHREVEPORT, Defendant-Appellee.
No. 22221-CA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1991.
Writ Denied May 27, 1991.
*1168 William T. Allison, Shreveport, for plaintiff-appellant.
Lawrence K. McCollum, Shreveport, for defendant-appellee.
Before SEXTON, NORRIS and VICTORY, JJ.
SEXTON, Judge.
The plaintiff, Joy Manson, appeals the trial court judgment which denied her claim for worker's compensation benefits, penalties, and attorney fees. The plaintiff was injured on August 26, 1983, while in the course and scope of her employment with the defendant, City of Shreveport. However, the trial court rejected her claim for worker's compensation, finding the plaintiff was no longer disabled on February 24, 1987, when her employment was terminated by the defendant. We affirm.
On August 26, 1983, the plaintiff had been employed for four years as a secretary for the Shreveport Fire Department. On that date, while in the course and scope of her employment, she fell down a flight of stairs. There is no dispute that the plaintiff was injured in the accident, that she suffered headaches and was unable to work for nearly a year. There is also no dispute that, during that year, the city paid plaintiff full worker's compensation benefits.
On August 1, 1984, the plaintiff returned to work for the city as a senior secretary in the Department of Human Resources. The plaintiff apparently continued to suffer from headaches, some of which were severe enough to cause her to miss work. From August 1, 1984, until September 10, 1986, the plaintiff was compensated by the city with two-thirds of her usual salary for the days she missed work due to headaches. The city stopped paying these benefits on September 10, 1986. The city did, however, continue to pay plaintiff's medical bills.
*1169 According to the testimony of city representatives, the city stopped paying plaintiff for the days she missed due to headaches when it was determined that plaintiff was earning at least 90 percent of the wages she had earned prior to the accident, making her ineligible for supplemental earnings benefits. This testimony is somewhat confusing as the record reflects that plaintiff was earning more money immediately upon her return to work than she had been prior to the date of the accident. She was thus never statutorily entitled to supplemental earnings benefits. LSA-R.S. 23:1221(3). It appears this remuneration was pursuant to an informal contractual arrangement between the plaintiff and the city.
Although plaintiff was no longer being compensated for the days she missed due to her headaches, she nevertheless continued to be employed by the city until February 24, 1987. Plaintiff's absences between September 10, 1986, and February 24, 1987, were credited against her sick leave, annual leave, etc. When plaintiff had exhausted her various leave allowances, the city terminated her employment for what it termed her abandonment of her job. The plaintiff, of course, asserted that her alleged abandonment of her job was actually caused by the headaches stemming from her August 26, 1983, accident.
The plaintiff's lawsuit sought temporary total disability benefits from the date her employment was terminated, February 24, 1987. Following a five-day bench trial, which ended on July 21, 1988, the trial court ordered both sides to file briefs. By written opinion dated January 16, 1990, the trial court rejected plaintiff's demands. The trial court found that plaintiff had abandoned her employment in order to move to Texas for social reasons, rather than because of any compensable disability. The court found that plaintiff had exaggerated her injuries and misrepresented her ability to perform her job functions. In short, the trial court made a credibility determination and found the plaintiff had failed to prove she was still suffering from any disability. A judgment rejecting plaintiff's demands was signed on February 1, 1990.
The only issue on appeal is whether the trial court was in error in finding the plaintiff failed to prove by a preponderance of the evidence that she remained disabled on February 24, 1987, due to her work-related accident of August 26, 1983.
Although the Louisiana Worker's Compensation Act, LSA-R.S. 23:1021, et seq., is to be construed liberally in favor of the claimant, the plaintiff's burden of proof is not relaxed. The burden remains on the plaintiff to prove her claim by a preponderance of the evidence. Prim v. City of Shreveport, 297 So.2d 421 (La.1974); Burnes v. Wizard Enterprises, Inc., 543 So.2d 616 (La.App. 2d Cir.1989).
The finding of disability within the framework of the worker's compensation law is a legal rather than a purely medical determination. Barry v. Western Electric Company, Inc., 485 So.2d 83 (La.App. 2d Cir.1986), writ denied, 487 So.2d 441 (La. 1986); Calhoun v. Fireman's Fund Insurance Companies, 437 So.2d 900 (La.App. 2d Cir.1983). Thus the question of disability must be determined by reference to the totality of the evidence, including both lay and medical testimony. Crawford v. Al Smith Plumbing & Heating Service, Inc., 352 So.2d 669 (La.1977); Jackson v. Georgia Casualty and Surety Company, 513 So.2d 530 (La.App. 2d Cir.1987), writ denied, 515 So.2d 448 (La.1987).
Ultimately, the question of disability and, more specifically in regard to the instant case, whether plaintiff's headaches remain substantial enough to constitute a disability for worker's compensation purposes, is a question of fact. See, Barry v. Western Electric Company, Inc., supra; Latiolais v. Home Insurance Co., 454 So.2d 902 (La.App. 3rd Cir.1984), writ denied, 460 So.2d 610 (La.1984). Accordingly, we note that an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Thus, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 *1170 So.2d 1330 (La.1978). Such deference to a trial court's factual findings and credibility determinations applies as well in worker's compensation cases. Ducote v. J.A. Jones Construction Company, 471 So.2d 704 (La.1985); Culp v. Belden Corporation, 432 So.2d 847 (La.1983).
We find the trial court's factual finding that plaintiff was no longer disabled on the date her employment was terminated, which finding was based predominantly on the trial court's credibility determinations, is supported by the record and is not clearly wrong.[1]
Testimony revealed that prior to the date of termination, plaintiff may have been abusing the city's sick leave policy and the special arrangement she had with the city regarding compensation for absences associated with her headaches. On one occasion, Candace Higginbotham, the assistant director of the Department of Human Resources, saw the plaintiff at a New Year's Eve party after the plaintiff had called in sick both New Year's Eve day and the preceding day. The plaintiff did not deny being at the party, but claims she had felt obligated to attend, and she testified, without corroboration, that she left immediately after vomiting at the dinner table. On another occasion, the plaintiff was discovered to have been at a golf tournament, although allegedly only for a brief time to register her boyfriend, on a day she had been too ill to go to work.
We also note that the plaintiff seemed to require less medical, therapeutic, and pharmaceutical treatment for her headaches after her termination from employment with the city. This, too, supports the trial court's conclusion that plaintiff may have been exaggerating her injuries and misrepresenting her ability to work. Her employment was terminated on February 24, 1987, and she moved to Dallas sometime in March 1987. From that time until trial, the plaintiff only saw a doctor for treatment of her headaches twice. On each occasion, in November 1987 and in May 1988, the plaintiff returned to Shreveport to see her treating neurologist, Dr. Nabil Moufarrej. Following her accident, until she left Shreveport, plaintiff had previously sought treatment from Dr. Moufarrej every two to three weeks or two to three months.
The plaintiff also required no hospitalization for her headaches after she moved to Dallas. Conversely, while she was in Shreveport and still employed by the city, the plaintiff had been taken to the hospital for treatment of her headaches on numerous occasions. Keith Lehr, with whom the plaintiff had lived for two and a half years while she was employed by the city, testified that he took the plaintiff to the hospital three to four times when her headaches were especially severe. The plaintiff's daughter, Julia Manson, testified that she took her mother to the hospital five to ten times while plaintiff worked for the city, in addition to other occasions when the aforementioned Mr. Lehr and a Ms. Covern, the plaintiff's next-door neighbor, had taken her to the hospital.
A corresponding decrease in plaintiff's physical therapy treatments was also seen; she went from 73 days of treatment between 1985 and February 1987, to no treatments after her move to Dallas. A decline in plaintiff's medication was also noted, as her prescriptions for pain medication decreased after her move to Dallas. All of *1171 these factors would seem to be an implication either that plaintiff's headaches have improved since she left Shreveport or that she had been misrepresenting their severity while employed by the city. Either interpretation would support the city's position and the trial court's conclusion that the plaintiff is not now disabled.
The city presented additional evidence of the plaintiff's present ability to work in the form of surveillance testimony and videotapes which show her at the Griffin Company offices, a truck and trailer dealership owned by David Griffin, the man with whom the plaintiff lives in Dallas. The tapes were made on March 24, 25, May 2, 3, June 6, 7, 8, 9, 10, 15, 16, 17, 27, 28, 29, 30, and July 1, 1988. With few exceptions, the tapes show that plaintiff consistently arrived at the Griffin offices between 10:21 a.m. and 12:53 p.m. and left the offices between 5:01 p.m. and 6:18 p.m.; such was her routine on 13 of the 17 days taped. On one of the remaining days, surveillance showed the plaintiff had company at Mr. Griffin's residence. On a second date, a painter was at the residence. On a third date, the plaintiff arrived at the Griffin offices at 12:47 p.m. but left at 3:09 p.m., apparently to go shopping.[2] June 28 was the only occasion that plaintiff did not go to the office that surveillance could not provide an apparent reason for plaintiff's departure from her usual schedule.
Plaintiff notes that evidence in the form of videotapes must be approached with caution because they show only intervals of the activities of the subjects, they do not show rest periods and do not reflect whether the subject is suffering pain during or after the activity, citing Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La. 1983). However, Orgeron dealt with a plaintiff involved in heavy physical labor who sought worker's compensation. The defendant had relied on the videotapes to terminate plaintiff's benefits. The Louisiana Supreme Court found that, because of the aforementioned unreliability of the videotapes, it was arbitrary and capricious for the employer to cease paying benefits based on those tapes in total disregard of contrary medical opinions.
The instant case is clearly distinguishable from Orgeron. The city did not rely on the videotapes to deny benefits. The earliest videotape was made some 18 months after benefits were terminated and 14 months after plaintiff's employment was terminated. Additionally, the concern for showing only intervals of activity is decidedly less of a factor in the instant case. The plaintiff testified that it is only the most severe headaches which prevent her from working. These severe headaches are marked by nausea, dizziness, and blackouts, requiring that plaintiff remain in bed and at times seek hospitalization. The videotapes, irrespective of the Orgeron concerns, were clearly evidence that Ms. Manson was not suffering from the severe headaches on any of the dates shown, with the possible exception of June 28.
By her own admission, plaintiff is either able to work or is disabled by a headache which confines her to bed for up to three days at a time. A videotape showing plaintiff was not confined to her bed indicates she was not disabled on that date. Contrary to the videotapes in Orgeron, which were inconclusive as to whether the plaintiff was or was not partially disabled, the videotapes in the instant case are probative evidence that Ms. Manson was not disabled on the vast majority of the days she was videotaped. The videotapes were properly considered by the trial court.
We next consider the medical testimony presented in this case. That testimony, which can be fairly classified as incomplete and inconclusive, does not convince us the trial court was manifestly erroneous in rejecting plaintiff's claim for worker's compensation. The plaintiff's testimony revealed that at least nine doctors treated her for headaches; however, the record contains the testimony of only two of those doctors. Dr. Moufarrej testified for the plaintiff as her predominant and most recent treating physician. He diagnosed plaintiff as suffering from post-traumatic *1172 headaches, but admitted that stress and the plaintiff's menstrual cycle could have contributed to her headaches. He also noted that plaintiff had a family history of high blood pressure and related headaches. Dr. Moufarrej also testified that the plaintiff's decreased intake of medicine and her failure to make medical, hospital, or therapy visits after she had moved to Dallas might be an indication that plaintiff's headaches are improving. Dr. Moufarrej also testified that, as the plaintiff related to him that physical therapy helped control the severity of her headaches, he had recommended that plaintiff continue with the therapy, which advice she obviously disregarded after moving to Dallas.
Dr. William Phillip Osborne, a specialist in algology, the study of pain, testified on behalf of the city. Although Dr. Osborne spent only 30 minutes with the plaintiff, he did review her X-rays, reports from other doctors who had seen her, and various psychological tests performed upon the plaintiff. In Dr. Osborne's expert opinion, the plaintiff was no longer suffering from post-traumatic headaches. Dr. Osborne initially felt that plaintiff had mixed headaches, some vascular, of which the posttraumatic headache would be one type, and some muscle tension headaches. However, in Dr. Osborne's experience, post-traumatic headaches dissipate some four to six months after the trauma. Dr. Osborne testified that any remaining headaches plaintiff suffers from are muscle tension headaches in conjunction with rebound headaches, which are a result of excessive medication. In short, neither physician could, with any degree of certainty, link plaintiff's headaches to the August 26, 1983, accident.
Finally, in light of our conclusion that the trial court was not clearly wrong in finding that plaintiff failed to prove her continuing disability, we must reject plaintiff's argument that she is entitled to a presumption that her headaches were caused by her August 26, 1983, accident. Plaintiff's legal assertion is accurate: a claimant's disability is presumed to have resulted from an accident where, before the accident, the injured person was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves thereafter, providing there is medical or circumstantial evidence indicating a reasonable possibility of the causal connection between the accident and the disability. See, for example, Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985). This shifts the burden of proof to the defendant to rebut the presumption. Nevertheless, the presumption regarding a causal connexity is inapplicable where, as in the instant case, the trial court has found that the plaintiff failed to prove a continuing disability, which finding we have determined is not clearly wrong.
In conclusion, we do not find the trial court to have been clearly wrong in ruling that plaintiff failed to prove by a preponderance of the evidence that she was still disabled when her employment was terminated on February 24, 1987. Accordingly, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] Appellant's first assignment of error points out that the trial court, in concluding that the plaintiff was not disabled, based its decision in great part on the credibility of the plaintiff. Appellant thus complains that this credibility determination should not receive its usual deference because it was made after 17 months of deliberation. Unfortunately, we often review cases where the trial judge makes a credibility call after a significant delay. The question of whether the credibility decisions of the trial court should receive their customary weight after significant delay has been a source of concern to members of this court for some time; thus, plaintiff's argument has found a sympathetic audience.

However, we are unaware of any jurisprudence allowing us to reduce the usual deference we give to trial court credibility determinations based on delay between trial and opinion. Further, the prevention of delay in the trial court is a matter which addresses itself to the Louisiana Supreme Court. Notwithstanding these observations, the credibility determinations in the instant case appear well supported by the record.
[2] Surveillance trailed her to a shopping mall.