JUDE G, GRAVOIS, Judge, .

INTRODUCTION

| aPlaintiff/appellant, Carlos Suarez, appeals the trial court’s June 2, 2015 judgment that maintained defendant/appellee, Alvin. Acosta’s,, peremptory exception of prescription/peremption in.. this paternity/avowal action brought by Mr. Suarez. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

Alvin Acosta and Suyapa Casco Acosta (“Suyapa”) were married on January 21, 2007.[1] On February 14, 2007, Adriana Acosta Was born to Suyapa. Mr. Acosta is listed as Adriana’s father on her birth certificate. On April 24,2012, Suyapa died of leukemia.
On February 13, 2015, Mr. Suarez filed a “Petition for Paternity Suit, Child Custody and Child Support” against Mr. Acosta.[2] Pertinent to his patemity/avowal suit, Mr. Suarez alleged that prior to the Acos-tas’ marriage, he maintained a ^relationship with Suyapa that resulted in the conception and birth of Adriana. He further alleged that he was “intentionally deceived” by Suyapa as to his status as Adriana’s biological father, In March of 2014, he was, told by a co-worker, Trenella Daigs, that he was Adriana’s biological father. As a result of learning this information, “he underwent-DNA testing.” According to the petition, “the results of the DNA test proved with 99.999999% certainty” that Mr. Suarez is Adriana’s biological father.[3] Thus, Mr. Suarez alleges that he could not have known that Adriana was his child until he received the DNA test results proving his paternity.
In response, on March 25, 2015, Mr. Acosta filed exceptions of no cause and/or no right of action, and prescription and/or peremption[4] as to Mr. Suarez’s paternity/avowal action concerning Adriana. A hearing on the exceptions was held before the domestic commissioner on April 15, 2015.
Both Mr. Acosta and Mr. Suarez testified at the hearing before the domestic commissioner. Mr. Acosta testified that he met Suyapa in 2004 when they both worked at Pep Boys. They became engaged in 2006 and married in 2007. They had two children, Adriana and Gabriella.[5] Mr. Acosta testified that his name is on both childrén’s birth certificates,, and they both call him “Daddy.” Mr. Suarez also worked at Pep Boys. Mr. Acosta testified that during the time he and Suyapa were dating and later married, Mr. Suarez and Suyapa were “best friends,” and Mr. Suarez would call her “every day to tell her good morning.” However, as far as Mr. Acosta knew, there was no ongoing sexual *629 relationship between Mr. Suarez and Suya-pa.
|4Mr. Acosta further testified that- on January 23, 2007, two days after he and Suyapa were married and before Adriana was born, he received a call from a lady claiming to be Mr. Suarez’s girlfriend who informed him that Suyapa was calling Mr. Suarez and claiming that Adriana was Mr. Suarez’s child. Mr. Acosta called Suyapa to ask her about these claims. She told him to “hold on,” and a few minutes later, Mr. Acosta received a call from Mr. Suarez. According to Mr. Acosta, during their phone conversation, after learning that Mr. Acosta and Suyapa had gotten married, Mr. Suarez told Mr. Acosta that the child was his, and he was going to force Mr. Acosta to take a DNA test. Thereafter, sometime between that phone call and when Adriana was born, while Mr. Acosta was picking Suyapa up from work, Mr. Suarez personally confronted Mr, Acosta. During their confrontation, Mr. Suarez first claimed that Suyapa had been with him that morning. He then told Mr. Acosta that if the baby was born on a specific due date, then it was his child, and he was going to force Mr. Acosta to take a DNA test. Mr. Acosta testified -that he did not talk to Mr. Suarez again until after Suyapa passed away, more than five years later. To his knowledge, prior to this suit, Mr. Suarez did not bring any legal action or make a formal request for a DNA test, though Mr. Suarez could have found Mr. Acosta if he needed to.
Mr. Suarez testified before the domestic commissioner that he met Suyapa -at Pep Boys sometime in 1997 or 1998, and he began having a sexual relationship with her sometime in late 2001 or 2002. It was an “on and off thing.” He admitted to having sex with Suyapa in 2006, even after she became pregnant. Once Adriana was born, they no longer had a physical relationship. He testified that he spoke to Mr. Acosta in 2005 or 2006, but “[he didn’t] think [he] made any threats or any allegations of [him] being the father,” because he had not yet learned Suyapa was pregnant. When he learned that she was pregnant, he asked her twice if the child |Bwas his, and she told him that the child was not his. He testified that both conversations that Mr. -Acosta testified about “never -happened.” He also testified that he did not learn that he was the-child’s father .until a co-worker told him of such in March of 2014. According' to Mr. Suarez, his coworker was told this information by Suya-pa sometime , before her death -and by her mother, Mrs. Casco, and when asked about proof, Mr. .Suarez stated that they were “real close friends.” He further testified that he saw- Suyapa after Adriana was born and has seen Adriana since she was born “maybe once or. twice a month.” When the domestic. commissioner, asked him if he had any suspicions that the child might be his when he saw her, he said no because “she didn’t look like [him.]”
At the end of the hearing, the domestic commissioner orally granted the exception of prescription/peremption; he issued a written judgment to that effect on April 20, 2015. On April 17, 2016, Mr. Suarez filed an objection to the domestic commissioner’s order and requested an evidentia-ry hearing before the district court. The hearing.before-the district.court was held on May-19, 2015.
At -the b'éginning of the "hearing before the district court, counsel for Mr. Acosta noted that-the..day-before, she had received a letter.-stating, that a new attorney, •Tracy Sheppard, was,“potentially going to represent, [Mr. Suarez],”, but no motion to enroll or motion. for a continuance had been.filed.' The-court noted that since there, .was no motion.to. enroll filed, the attorney was not counsel of record. The *630 hearing proceeded with Mr. Acosta’s testimony.
-Mr. Acosta testified before the district court that before Adriana was born, he received a call from a girlfriend of Mr. Suarez who said that Suyapa was claiming that Adiiana was Mr. Suarez’s child. Mr. Suarez then called claiming the child was his and that he was going to force Mr. Acosta to take a paternity test. Mr. Acosta also described a second incident at Pep Boys where Mr. Suarez | ^approached Mr. Acosta “giving [him] the due date of when Adriana was supposed to be born, telling [him] that it was his kid and he was going to make [him] do a D.N.A. test.”
When it was time for Mr. Suarez to cross-examine Mr. Acosta, Mr. Suarez stated, “Your Honor, I was looking for an extension for 30 days with Ms. Tracy Sheppard. I don’t know if it was granted or not.” He stated that he had talked to Ms. Sheppard, but did hot meet with her until the day before the hearing. The court thereupon responded that Mr. Suarez had 30 days to rétain a new attorney after his previous attorney withdrew because Mr. Suarez no longer wanted her to represent him in this matter. The court noted that Mr. Suarez knew about the hearing when he discharged his previous attorney. The court stated that Mr. Suarez should have filed a motion for a continuance “as soon as [he] ■ knew that [he wasn’t] going to have an attorney here, not once the hearing is already commenced.” The trial court then denied Mr. Suarez’s request for a continuance!
The court then -allowed Mr. Suarez to question Mr. Acosta, -but he did not have any questions for Mr. Acosta. Mr. Suarez then took the stand..' He testified that he had an “on and off again” sexual relationship with Suyapa, and after learning she was pregnant, he asked her a couple of times if the child was his. He was told the child was not his. He testified that Mr. Acosta’s testimony regarding their encounters was “a lie.” He went on to describe “what really happened.” He stated that one time he was driving home when Mr. Acosta “cut [him] off.” Mr. Suarez followed him to Pep Boys, but “at no time did [he] tell him that it was. a possibility of Adriana being [his child.]” He also stated that Suyapa never lived in Waggaman where Mr. Acosta said they lived, and that his friend, Ms. Daigs, the same friend who told him about the baby being his in 2014, was in court and could confirm this. Following his questioning, Mr. Suarez was told by the court to |7provide any other information that was not asked but that he wanted on the record. When Mr. Suarez was done speaking, the court asked if there were any other witnesses. Nothing further was presented.
At the conclusion of the hearing, the trial court orally sustained the domestic commissioner’s granting of the exception of prescription/peremption and held that Mr. Suarez’s paternity/avowal action was deemed perempted and was accordingly dismissed. A judgment to that effect was signed on June 2, 2015. On September 17, 2015, Mr. Suarez filed the Motion for De-volutive Appeal and Notice of Appeal. This appeal followed.

TIMELINESS OF THE APPEAL

In response to the appeal, Mr. Acosta filed a motion to dismiss ’the appeal as untimely. In his motion, Mr. Acosta argues that the final judgment was entered in open court on May 19, 2015 and signed on June 2, 2015. He argues that a copy of the signed judgment was mailed to Mr. Suarez by Mr. Acosta’s counsel, and no service of the judgment was required. Mr. Acosta argues that the delays for filing the instant appeal elapsed 67 days from the signing of the judgment, or on *631 August 12, 2015. In. support of his argument, Mr. Acosta relies on a number of cases where the court held that a notice of signing of judgment was not required where the decree rendered was not a default judgment, the case was not taken under advisement by the court, a judgment was read into the record on the date of the hearing of the trial, and no request was made for a notice of the date when the judgment was signed. See Mitchell v. La. Power & Light, Co., 380 So.2d 743 (La. App. 4th Cir.1980); Bargas v. Land, 457 So.2d 1278 (La.App. 1st Cir.1984); McCarstle v. McCarstle, 317 So.2d 306 (La. App. 1st Cir.1975), writ denied, 320 So.2d 906 (La.1975).
[RA devolutive appeal may be taken only within 60 days of either the expiration of the delay for applying for a new trial, if no application has been filed timely, or the date of the mailing of the notice of the court’s refusal to grant a timely filed application for a new trial. La. C.C.P. art. 2087(A). The delay for applying for a new trial is seven days, exclusive of legal holi--days, commencing on the day after the clerk has mailed, or the sheriff has served, the notice of judgment. La. C.C.P. art. 1974. Regarding the notice of judgment, La! C.C.P. art.1913 currently provides, in pertinent part:
A. Except as otherwise provided by law, notice of the signing of a final judgment, including a partial final judgment under Article 1915, is required in all contested cases, and shall be mailed by the clerk of court to the counsel of record for each party, and to each party not represented by counsel.
[[Image here]]
D. The clerk shall file a certificate in the record showing the date on - which, and the counsel and parties to whom, notice of the signing of the judgment was mailed.
(Emphasis added.)
Pursuant to the current version La. C.C.P. art.1913,[6] since this was a “contested case,” the Clerk of Court was required to mail notice of the signing of the final judgment in this case. Thus, the appeal delays did not begin-until the mailing of the notice of .signing of the judgment by the Clerk of Court. According to the record, the judgment on the exception of prescription/peremption was signed on June 2, 2015; however, the Clerk of Court did not mail the notice of the signing of judgment until August 20, 2015. On September 3-, 2015, a corrected notice of the signing of judgment was mailed by the Clerk of Court. No motion for a new trial was filed. Mr. Suarez’s motion for a devolutive appeal was filed on September 17, 2015, well within the appeal delays of either the original August 20, |q2015 mailing of the notice of the signing of the judgment or the September 3, 2015 mailing of the corrected notice -of the signing of the judgment. Accordingly, this appeal is timely.

ASSIGNMENTS, OF ERROR NUMBERS ONE AND TWO

In his first assignment of error, Mr. Suarez argues that the trial court committed manifest error, by denying his request for a continuance to retain counsel. In his second assignment of error, Mr. Suarez argues that the trial court erred by “allowing an unrepresented litigant to proceed to trial knowing he is not farpiliar with the judicial process.” More particu *632 larly, Mr. Suarez argues that he was unaware that he could cross-examine Mr. Acosta, and he was only given a “limited and restricted opportunity to expound on his previous testimony regarding his knowledge.” Mr. Suarez argues that because he was unaware of the procedures, he could not call his witness, Ms. Daigs, who was present in the courtroom.
A continuance may be granted in any case if there is good ground therefor; La. C.C.P. art. 1601. In determining whether to grant a continuance, the trial court must consider the particular facts in each case. Some factors to consider are diligence, good faith, and reasonable grounds. Bolden v. Jeffrey’s Steel Co., 96-518 (La.App. 5 Cir. 12/11/96), 684 So.2d 1102, 1105, writ denied, 97-0418 (La.3/27/97), 692 So.2d 399. The trial court may also weigh the condition of the court docket, fairness to' the parties and other litigants before the court, and the need for orderly and prompt administration of'justice. Gilmore v. Wickes Lumber, 04-2769 (La.App. 1 Cir. 2/17/06), 928 So.2d 668, 674. A trial court has great discretion in granting or denying a motion for a continuance under La. C.C.P. art. 1601, .and that discretion will not be disturbed on appeal in the absence of clear abuse of | indiscretion. Morris v. Westside Transit Line, 02-1029 (La.App. 5 Cir. 2/25/03), 841 So.2d 920, 928, writ denied, 03-0852 (La.5/16/03), 843 So.2d 1132.
Because the discharge of one’s lawyer is not, by itself, grounds for the postponing of another party’s access to the courts for a decision in a pending action, the client bears the burden of showing other circumstances that would justify a continuance. For example, a reasonably diligent client having fired his lawyer for unpreparedness could be “good” grounds for a continuance in the absence of counterbalancing circumstances. Rainone v. Exxon Corp., 93-2008 (La.App. 1 Cir. 1/13/95), 654 So.2d 707, 711, writ denied, 95-0337 (La.3/24/95), 655 So.2d 1340.
According to the record, on March 25, 2015, when the court set the hearing on the exception of prescription/peremption with the domestic commissioner, it also noted that any objection made to the domestic commissioner’s ruling would go before the district court on May 19, 2015. Mr. Suarez filed his objection to the domestic commissioner’s order on April Í6, 2015. On April 22, 2015, the court did indeed order that the evidentiary hearing be set on May 19, 2015. It is unclear when Mr. Suarez’s previous attorney withdrew as counsel, as the motion to withdraw is not part of the record provided to this Court on appeal. The trial court noted however that Mr. Suarez knew about the hearing when he discharged his previous attorney. Further, according to the trial court, Mr. Suarez’s previous counsel withdrew because “[Mr. Suarez] told her.[he] no longer wanted her to represent [him] in this matter.” Mr. Suarez did not expound on why he discharged his previous attorney at the hearing. Though he did seek new counsel, Mr. Suarez admitted that he had talked to the attorney, but did not meet with her until the day before the hearing. The attorney did not file a motion to enroll, nor was any motion for a continuance filed, and Mr. Suarez did not move for a continuance In until after the hearing was well under way. Additionally, during the hearing, the trial court gave Mr. Suarez the opportunity to question Mr. Acosta and present his own testimony. After Mr. Suarez was done speaking, the court asked if there were any other witnesses. Nothing further was presented.
Upon review, considering the particular facts and circumstances of this case, that Mr. Suarez knew of the hearing when he discharged his prior counsel, that he did *633 not meet with potential new counsel until the day before the hearing, that he only moved for the continuance after the hearing began, and that he was given full opportunity to present his case, we find that the trial court did .not abuse its broad discretion in denying Mr.'Suarez’s motion for a continuance. These assignments of error are without merit..

ASSIGNMENT OF ERROR NUMBER THREE

In his third and final assignment of error, Mr. Suarez argues that the trial court committed manifest error in finding that Mr, Suarez was perempted from claiming paternity of the minor child.
La. C.C. art. 198 provides, in pertinent part:
A man may institute an action to establish his paternity of a child at any time except as provided in this Article. The action is strictly personal.
If the child is presumed to be the child of another man, the action shall be instituted within one year from the day of the birth of the child. Nevertheless, if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known Of his paternity, or within ten years from the day of the birth of the child, whichever first occurs. In all cases, the action shall be instituted no later than one year from the day of the death of the child.
The time periods in this Article arel per-emptive.'
(Emphasis added.)
|12La. C.C. art. 185 states that the husband of the mother is presumed to be the father of a child born during the marriage. Since Mr. Acosta and Suyapa Wére married at the time of Adriana’s' birth/ Mr. Acosta is presumed to be Adriana’s father. Considering this, Mr. Suarez was required to file his paternity/avowal action within one. year of Adriana’s birth, unless he was “in bad faith deceived” by Suyapa regarding -his. paternity. Mr. Suarez argues that he was deceived, and he did not learn that he was the child’s father until after he was told such by-a coworker in March of 2014 and subsequently had a DNA test performed, Thus, he argues that his suit filed in February 2015 was timely.. "
At the hearings,[7] Mr. Suarez testified that he had an on and off again physical relationship with Suyapa from late 2001 or 2002 until the minor child was born and admitted to having had sex with Suyapa in 2006 and continued to havé sex with her even after she became pregnant. When he learned Suyapa was pregnant, Mr. Suarez testified that he asked her a couple of times if the child was his, and she told him no. He admitted to seeing Suyapa after the child was born and admitted to continually seeing the child as often as once or twice a month since the child’s birth. He alleges, however, that he did not have any reason to doubt Suyapa, and it was only later, after Suyapa’s death, when a coworker told him the child was his, did he get a DNA test and learn that he was the father.
Mr. Acosta presented different facts. According to Mr. Acosta, he was approached twice,' before the baby was even born, by'Mr. Suarez who claimed the child was his: and he was' going to force 'Mr. Acosta to take a DNA test. Though Mr, Suarez knew where to find Mr. Acosta if he so needed, Mr. Suarez did -not make any formal request for a DNA test or take *634 any legal action until eight years after these incidents allegedly occurred.
113It is well settled that a court of appeal may not set aside the trial court’s findings of fact in the absence of manifest error or unless they are clearly wrong. Further, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Id.
The trial court found that Mr. Suarez knew or should have known that he was Adriana’s biological father at least eight years before he filed this suit, and thus his paternity/avowal action was perempted. Based on the evidence presented, we cannot say that the trial court’s findings of fact in this regard are manifestly erroneous or clearly wrong. Further, in light of the conflict between the testimony of Mr. Suarez and that of Mr. Acosta, we cannot say that the trial court’s evaluations of credibility and inferences of fact in this case were unreasonable. Accordingly, we find no error in the trial court’s ruling that Mr. Suarez’s paternity/avowal action was perempted. This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, we affirm the trial court’s judgment sustaining Mr. Acosta’s exception of prescription/preemption.

MOTION TO DISMISS APPEAL DENIED: AFFIRMED

. The record provides in several occasions' that Mr. and Mrs. Acosta were married on January 24, 2007.

. Mr. Suarez filed the petition with co-plaintiff, Maria Casco, Suyapa’s mother. In the petition, Mr. Suarez states that he believes it is in the child's best interest to remain in Mrs, Casco’s custody. The issues of custody and child s.upport are not before this Court in this proceeding.

. The petition states that a copy of the paternity (DNA) test results was attached as an exhibit to the petition; however, this document is not part of the record provided to this Court.

. .Mr. Suarez also filed, in the alternative, exceptions of improper cumulation of actions and non-joinder of indispensable parties with request for attorneys'' fees and court costs.

. Mr. Suarez is not claiming to be Gabriela's biological father.

. The cases Mr. Acosta relies upon in his motion to dismiss were rendered under a prior version .of La. C.C.P. art.1913.

. It is noted that Mr. Acosta introduced the transcript of the hearing before the domestic commissioner as an exhibit at the hearing before the district court.